**FILED**

Jul 15 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

# United States District Court

### for the

Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Aleksei Kiselev | ) | Case No.   3:22-mj-70921 MAG |
| and | ) | |
| Vladyslav Polyanskyy, | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___January 2022 through July 2022___ in the county of ___San Francisco___ in the ___Northern___ District of ___CA and elsewhere___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Count One: 18 U.S.C. § 1956(h) | Conspiracy to Launder Monetary Instruments |
| Counts Two through Four: 18 U.S.C. § 1956(a)(3)(B) | Laundering Monetary Instruments |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

Approved as to form: AUSAs Dawson
& Hosseini

Sworn to before me by telephone.

Date:   ___07/14/2022___

City and state:   ___San Francisco, CA___

/s/ Christopher Bognanno
*Complainant's signature*

Christopher Bognanno, Special Agent, FBI

*Judge's signature*

U.S. Magistrate Judge Alex G. Tse
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF ARREST WARRANT AND CRIMINAL COMPLAINT**</u>

**I.      Introduction and Agent Background**

I, Christopher Bognanno, a Special Agent of the Federal Bureau of Investigation (FBI),
United States Department of Justice, being duly sworn, hereby declare and state as follows:

1.      I am a Special Agent of the FBI assigned to the Eurasian Transnational Organized
Crime Squad.  I have been employed as a Special Agent since March 2015.  As such, I am an
investigative or law enforcement officer of the United States within the meaning of Section
2510(7) of Title 18, United States Code, that is, an officer of the United States who is
empowered by law to conduct investigations of and to make arrests for offenses enumerated in
Section 2516 of Title 18, United States Code.  My training includes formal classroom and field
training at the FBI Academy's New Agent Training Program in Quantico, Virginia, which
included, but was not limited to, physical surveillance, legal statutes and procedures, financial
investigations, money laundering techniques, investigative procedures, asset identification,
forfeiture and seizure, confidential source management, evidence collection, and electronic
surveillance techniques, including Title III monitoring.

2.      I am currently assigned to investigate violations related to organized crime,
including, but not limited to, wire fraud, money laundering, racketeering, and narcotics
trafficking.  As an FBI Agent, I am sworn and empowered to investigate criminal activity
involving violations of federal law and execute warrants issued under the authority of the United
States.  I graduated from James Madison University in 2004 with a Bachelor of Arts in History
and Criminal Justice.  In 2013, I earned a Master of Arts Degree in National Security and
Strategic Studies from the United States Naval War College.  Prior to my current position as a
Special Agent with the FBI, I held a number of positions, including Senior Legislative Assistant
and Communication Director, for a Member of the United States Congress.

3.      During my employment with the FBI, I have investigated violations of federal law
involving, but not limited to, complex financial crime, violent crime, public corruption, narcotics

1

trafficking, and money laundering.  My investigative experience includes, but is not limited to: conducting wire communication interceptions; interviewing subjects, targets and witnesses; executing search and arrest warrants; handling and supervising confidential human sources; conducting surveillance; and analyzing phone records and financial records. I have also received additional formal and on-the-job training from the FBI, as well as from the United States Attorney's Office and other federal agents who have done extensive work in the areas of financial crimes and organized crime.  I have participated in and led numerous investigations involving various forms of complex financial crime, international money laundering, violent crime, narcotics trafficking, and organized crime.

4.      To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including, but not limited to, physical and electronic surveillance, witness interviews, various types of infiltration to include confidential human sources, and cooperating sources.  I have utilized pen register and trap and trace devices, mail covers, pole cameras, stationary video recording vehicles, undercover operations, and audio/video recording devices.

5.      This affidavit is made in support of issuance of an arrest warrant and four-count criminal complaint alleging that **Aleksei Kiselev** and **Vladyslav Polyanskyy** committed:

       a.      Money Laundering Conspiracy in violation 18 U.S.C. § 1956(h)

       b.      Money Laundering in violation of 18 U.S.C. § 1956(a)(3)(B)

6.      The specific violations alleged against each defendant named above supporting the arrest warrant and criminal complaint are as follows:

//

//

//

//

//

| Count | Defendant(s) | Crime | Statute |
|---|---|---|---|
| Count One | KISELEV and POLYANSKYY | Conspiracy to (1) conduct or attempt to conduct a financial transaction involving property represented by a law enforcement officer, to be proceeds of specified unlawful activity or property used to conduct or facilitate specified unlawful activity, with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; and (2) to transport, transmit, or transfer, or attempt to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States [based on facts alleged in paragraphs 7 to 62 below] | 18 U.S.C. § 1956(h) |
| Count 2 | KISELEV and POLYANSKYY | Conducting or attempting to conduct a financial transaction involving property represented by a law enforcement officer, to be proceeds of specified unlawful activity or property used to conduct or facilitate specified unlawful activity, with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity [based on facts alleged in paragraphs 50 to 57 below] | 18 U.S.C. § 1956(a)(3)(B) |
| Count 3 | KISELEV and POLYANSKYY | Conducting or attempting to conduct a financial transaction involving property represented by a law enforcement officer, to be proceeds of specified unlawful activity or property used to conduct or facilitate specified unlawful activity, with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity [based on facts alleged in paragraphs 50 to 52, and 58 to 59] | 18 U.S.C. § 1956(a)(3)(B) |
| Count 4 | KISELEV and POLYANSKYY | Conducting or attempting to conduct a financial transaction involving property represented by a law enforcement officer, to be proceeds of specified unlawful activity or property used to | 18 U.S.C. § 1956(a)(3)(B) |

| | | conduct or facilitate specified unlawful activity, with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity [based on facts alleged in paragraphs 50 to 52, and 60 to 61] | |

## II. Statement of Probable Cause

### a. Background

7.      In early 2019, the FBI was alerted to the fact **Aleksei Kiselev**, ("**Kiselev**"), had contacted a Confidential Human Source ("CHS-1") in order to gain assistance with his intention to surreptitiously launder approximately $1 to $3 billion in funds, which were either frozen in European banks due to sanctions imposed by United States ("U.S.") or European Union ("E.U.") regulatory bodies, or which faced a high-level of international scrutiny because of financial irregularities or due diligence concerns associated with the account owner. Kiselev was already known to the FBI, due to previous reporting by CHS-1, as a registered Foreign Agent for former Ukrainian President Viktor Yanukovych ("Yanukovych"), as well as for Yanukovych's advisor, Eduard Prutnick. CHS-1 described Kiselev as Yanukovych's "money guy" while Yanukovych was in power. According to CHS-1, the money Kiselev sought to launder belonged to "top level" and "scary" individuals. CHS-1 interpreted these terms, used by Kiselev, to mean high-ranking Russian and/or Ukrainian public officials allegedly involved in widespread public corruption schemes, as well as individuals associated with Russian and/or Ukrainian organized crime syndicates. Kiselev refrained from identifying his clients by name. Kiselev needed CHS-1 to connect him with contacts who would wittingly facilitate the clandestine movement of funds out of the E.U. into the U.S., where they could be laundered through a prima facie legitimate financial vehicle. Kiselev intended to route the laundered funds back to his clients disguised as authentic proceeds of various types of business deals.

8.      In approximately April 2020, the FBI instructed CHS-1 to inform Kiselev that

CHS-1 had a contact in the U.S. who possessed the ability to effectively support comprehensive money-laundering operations through services akin to opening U.S.-based bank accounts, conducting bulk cash transfers, registering shell companies, purchasing U.S. real estate, and generating invoices and other financial records required to safely conceal illicit financial activity. The contact to whom Kiselev was referred was a FBI Undercover Certified Employee (UCE) posing as a professional money launderer employed by South and Central American-based, transnational, narcotics-trafficking cartels. The UCE (hereafter "UCE-1") was represented as a managing partner at a financial consulting company called MLI Ventures, LLC (MLI) based in San Francisco, California (CA). Kiselev indicated that he believed UCE-1 appeared to have the kind of expertise he needed, and asked CHS-1 to arrange a meeting between Kiselev, UCE-1, and CHS-1 somewhere on the U.S. East Coast in the near future.

9.      On August 19, 2020, Kiselev traveled to Boston, Massachusetts (MA) to meet with UCE-1 and CHS-1. At the meeting, Kiselev advised he had clients with financial problems related to $1.5 billion in funds currently frozen in European bank accounts due to international sanctions or locked by regulators for further review. Again, Kiselev refrained from identifying his clients by name. Instead, Kiselev described his clients as sanctioned people or people whose personal behavior and/or business activities had generated enough negative attention or scrutiny in the press to cause banks to refuse to complete their financial transactions. Specifically, Kiselev mentioned that one of his clients was a person who needed to move a large amount of cash out of Moscow, Russia. In general, Kiselev summarized his problem by suggesting that his clients, who all maintained large cash reserves, were unable to withdraw or transfer their funds because they had not adjusted to the changing regulatory climate brought about by a tougher approach to diplomatic and economic sanctions on the part of both the U.S. and E.U. in recent years.

10.      Further, Kiselev explained Russia had historically been a cash-based society and his clients had always depended on the ability to funnel money through the Baltics without banks or regulators asking questions. However, due to the current restricted environment, Kiselev's clients facing regulatory pressure sought what Kiselev described as, "to be frank [unintelligible

(UI)] money laundering."[1] Kiselev advised UCE-1 that he needed "alternative jurisdictions" in which to establish clean financial accounts for the purpose of mitigating risk by obfuscating the origin of the problematic funds through legitimate investments or asset purchases. Kiselev made clear he and his clients were looking to the U.S. as a solution for their cash conversion problem. Additionally, Kiselev mentioned he was working with a partner who was in Lichtenstein but did not provide his partner's identification or explain his partner's role in the scheme. In terms of Kiselev's interest in executing his money-laundering scheme, Kiselev indicated he would be paid a fee for successfully laundering his clients' funds.

11.     During the meeting, UCE-1 explained to Kiselev that he/she worked primarily with businessmen from Miami who imported "pineapples" from Panama about which UCE-1 was careful to never ask questions. UCE-1 told Kiselev he/she expected his/her clients had similar issues to Kiselev's clients regarding financial regulatory issues. UCE-1 detailed his/her capability to convert cash into a number of different forms of financial instruments; set up banking relationship and open bank accounts, register limited liability companies ("LLC") and special purpose vehicles ("SPV"); purchase real estate through trusts; and produce phony supporting documents, such as fake corporation or financial transaction records. UCE-1 and Kiselev discussed the need to designate nominee holders or beneficiaries for any financial structure employed in order to avoid liability problems. Additionally, Kiselev and UCE-1 examined several potential methods for moving targeted funds out of Europe and/or Russia into innocuous U.S. bank accounts. During their conversation, Kiselev expressed interest in bulk cash transfers, fictitious loans, and fraudulent real estate investment schemes. Kiselev inquired after UCE-1's rate for laundering money and expressed his intention to ascertain his clients' interest in UCE-1's services. At the conclusion of the meeting, Kiselev suggested they set up a group chat on an encrypted smartphone application called Signal (hereafter, "Signal"), which would allow for a secure, discrete communication.

---

[1] Quotations are sourced from unofficial transcripts prepared by the FBI of conversations recorded by FBI UCEs.

b. **The Power Grid Scheme**

12.     Between August 19, 2020 and September 23, 2020, Kiselev communicated with
UCE-1 and CHS-1 via Signal regarding his plans for utilizing UCE-1's services to facilitate his
clients' needs. While the majority of the communications were logistical in nature, a noteworthy
exchange occurred on September 9, 2020. Through a series of Signal messages, Kiselev pitched
a plan to launder approximately $1.2 to $1.5 billion through UCE-1 by means of a purchase
agreement, already in place at a private European bank (hereafter, "European Bank One"), to
acquire a construction company which specialized in the construction of power grid
infrastructure in exchange for a cash position in Europe (hereafter, the "Power Grid Scheme").
According to Kiselev's plan, UCE-1 would provide a buyer for the company, sourced from
UCE-1's transnational narcotics-trafficking cartel clients, who would put forward cash for the
purchase through European Bank One. The funds would be deposited into a SPV, allegedly
controlled by Kiselev's client. Kiselev counseled that this plan would allow both sides, Kiselev's
client and UCE-1's client, to conveniently and effectively clean their misbegotten funds. Kiselev
proposed he meet with UCE-1 again in New York City, New York (NY) or Washington, DC in
September 2020 to discuss the details.

13.     I have reviewed Signal messages sent between UCE-1 and Kiselev over
the course of this investigation. Below, appear transcripts of relevant messages sent by Kiselev to
UCE-1 in September 2020 regarding the Power Grid Scheme:

Kiselev:     A few years ago we underwrote a transaction for one of our client. His holding
group was selling a large company in the business of construction of power
stations and power grid lines. The deal didn't close and over a period of time the
asset itself lost a great deal of market value. But what remained is a formal
transaction that was approved and vetted through full compliance by a very large
and prominent European private bank. Under these terms the bank is still can
accept payments toward purchase of the underlying company with bank approved
value of 1.2-1.5 billion $. The funds will go into SVP [sic] that have been setup
for the purpose of this transaction,  this SPV also fully approved by the bank. The
bank is very flexible in terms of who is the buyer might be, meaning industry
specialty or expertise. There is an agreement that within 3-4 weeks they will
approve the potential buyer. Also the deal can be spread through the 3 year
period, when annually bank will be receiving $400-500 mil into SPV, according
to the predetermined scheduling.

If you can consider having one of your clients, which might be interested in actual cash position in Europe, being such a buyer, getting approved by the bank with our help and moving funds into SPV, control over which will go to our client who will provide the cash delivery in Europe, thus we can match both sides of this deal.

14.     On September 23, 2020, UCE-1 and CHS-1 met with Kiselev in Washington, D.C. At the meeting, Kiselev reaffirmed the fact the Power Grid Scheme was structured on a fictitious purchase of a power grid company through European Bank One. Again, Kiselev pitched the selling point that the phony buyer and seller would equally benefit from the deal. Providing more precise details on his scheme, Kiselev advised the buyer would launder his/her cash through the supposed purchase of the company, which would result in the funding of an escrow account held by European Bank One and attached to a SPV specifically created to facilitate the sale. By design, Kiselev stressed that the pending sale would not go through, and the buyer would instead own the escrow account worth $1.2 to $1.5 billion. Kiselev claimed that that European Bank One was not only aware the deal was designed to fail in order to facilitate a money-laundering scheme, but would profit by means of keeping a certain percentage of the total transaction.

15.     Kiselev's client, acting as the seller, would also benefit from the phony purchase by earning a fee for allowing the asset in question to enable the fraudulent transaction. According to Kiselev, European Bank One was willing to offer a flexible schedule in terms of funding the escrow. Therefore, as a result, the scheme would allow for a large amount of money to accrue without facing restrictive perimeters imposed by a bank, affording UCE-1's client the opportunity to launder extensive amounts with the added benefit of withdrawing cash at any time. Kiselev added that he was under pressure by European Bank One because the bank had clients of its own who wanted to pose as the fictitious buyer in order to enjoy the lucrative benefits of the scheme.

### c. Ukrainian Grain Contracts and Proposed Bribery Scheme

16.     Months later, however, on a Signal call with UCE-1, which occurred on April 9, 2021, Kiselev complained that the Power Grid Scheme, though not yet off the table, had experienced significant delays related to European Bank One's reservations regarding the clients he proposed as sellers.

17.     However, on a Signal call with UCE-1 which occurred on April 9, 2021, Kiselev provided an update on the Power Grid Scheme through which he indicated the deal was not yet off the table, but had experienced significant delays related to European Bank One's approval of the clients he proposed as sellers.

18.     On May 12, 2021, Kiselev and UCE-1 met in Dubrovnik, Croatia to attempt to finalize a money-laundering deal. In addition to discussing the stalled Power Grid Scheme, Kiselev advised he had come across a completely new method by which he potentially could launder millions through an existing apparatus based primarily in Ukraine (hereafter, "the Ukrainian Grain Contract Scheme"). In summary, the apparatus was structured on entirely phony or real, yet overvalued and inflated grain commodities contracts, certified by corrupt Ukrainian government officials utilizing fictitious tax and customs documentation, received by a shell corporation acting as a legitimate commodities trader located in Dubai, United Arab Emirates. Kiselev explained the grain contracts, whether falsified or overvalued, were connected to real grain traders in Ukraine and, therefore, perfectly served as the money-laundering scheme's main vehicle due to their unique ability to avoid scrutiny or detection. Funds currently frozen in sanctioned accounts, or bulk cash proceeds from any number of illegal activities, could be inserted into the purchase price of the grain contracts. These funds could be stored in clean accounts connected to the shell corporation or loaned out to individuals or groups who preferred

not to engage in conventional lending. Kiselev's money-laundering scheme was modeled after one supposedly employed by Russian Organized Crime syndicates in Ukraine in years past to take advantage of the generally corrupt and loosely regulated nature of Ukraine's massive grain commodities trading market. Kiselev estimated the Ukrainian Grain Contract Scheme could launder as much as $2 million to $3 million daily. Kiselev advised he would continue to gather details and keep UCE-1 informed on his progress.

19.     During the meeting with Kiselev present, UCE-1 initiated a Signal video telephone call between himself and UCE-2. UCE-1 introduced UCE-2 to Kiselev as UCE-1's business partner at MLI, who was located primarily in the greater New York City area. UCE-1 advised Kiselev that UCE-2, through MLI, performed identical work for South and Central American-based, transnational narcotics-trafficking cartel organizations, as well as clients with similar needs located in Asia, and was UCE-1's equal in both title and responsibility.

20.     As the meeting progressed, in addition to elaborating on previously discussed money-laundering schemes, Kiselev asked UCE-1 to help him secure U.S. tax return records for four Russian individuals (hereafter, "Extortion Targets") currently residing in America. Kiselev surmised UCE-1 had access to corrupt officials in the U.S. Government who were willing to take bribes from UCE-1's narcotics-trafficking cartel clients for certain services rendered. Kiselev advised the tax return information would potentially be used as means to extort the Extortion Targets on behalf of an unnamed Russian client.

21.     UCE-1 countered that Kiselev had a completely legal and direct method of confronting the Extortion Targets by means of a whistle-blowing complaint and/or an anonymous tip to the Internal Revenue Service ("IRS"). Kiselev advised his client had decided against such an approach because the process would likely be lengthy and there were no

assurances in achieving the desired goal.

22. Again, UCE-1 advised Kiselev of the advantage of a whistleblowing strategy over an extortion and bribery scheme, to which Kiselev acknowledged that whistleblowing was a legal approach, but his client preferred the guarantee of being paid quickly. Kiselev wrote down four Social Security numbers, which he explained corresponded with the identities of the Extortion Targets, on a piece of paper, which he handed to UCE-1.

23. At a second meeting which occurred on the same day, Kiselev requested a loan of $5 million for the term of one month, secured by real estate and yachts, after which the $5 million would be returned to a clean bank account. UCE-1 responded by admonishing Kiselev that UCE-1's clients tended not to make hard money loans. Further, UCE-1 warned Kiselev that UCE-1's clients were not the kind of people Kiselev would want to swindle; intimating that UCE-1's clients would resort to violent ends should they be robbed or deceived. Kiselev confirmed he understood UCE-1's meaning and continued to solicit the loan, stressing the advantage the loan offered to lender, who would have access to a clean $5 million accessible through a non-attributable financial account.

### d. UCE-1 Introduced to INDIVIDUAL 1

24. At the May 21, 2021 meetings in Croatia, Kiselev told UCE-1 he had an associate in the U.S., INDIVIDUAL 1, who was involved in the proposed bribery scheme concerning the Extortion Targets. Kiselev proposed UCE-1 meet with INDIVIDUAL 1, and further advised UCE-1 could speak plainly with INDIVIDUAL 1 about the scheme.

25. On May 27, 2021, UCE-1 met with INDIVIDUAL 1 in Boston, MA to discuss the bribery and extortion scheme. INDIVIDUAL 1 advised that he/she and Kiselev, "do problem solving in asymmetrical ways." Similar to Kiselev, INDIVIDUAL 1 emphasized the importance

of obtaining tax return records for the Extortion Targets in order to threaten and extort them effectively. INDIVIDUAL 1 understood UCE-1 had contacts in the U.S. Government, specifically at the IRS, by means of UCE-1's clients.

26.    INDIVIDUAL 1 advised that one of the Extortion Targets resided in Boston, MA, and explained that he/she and Kiselev wanted to, "present him with a set of facts which is the contradiction between his reported assets outside of the country and his real assets as of this [sic] country with the suggestion that if he settles with the debtors, that knowledge [will not be reported to law enforcement]."

27.    UCE-1 suggested that INDIVIDUAL 1 instead pursue a legal whistleblowing strategy, advising that the reward for presenting the IRS with $500 million in non-reported assets would likely be substantial. INDIVIDUAL 1 responded by agreeing that, "…straight-forward whistleblowing is clearly the legally preferred route, and also nobody is going to come back and say we are trying to blackmail somebody or use extortion because there is risk of that." Additionally, INDIVIDUAL 1 noted that the Russian client would be happy with a whistleblowing strategy, but the client had already decided to pay for the private tax return information and would like to use that knowledge to help plan next steps.

### e.    Kiselev Proposes New Approach to his Money-Laundering Scheme

28.    On October 5, 2021, UCE-1 and UCE-2 met with Kiselev in New York City, NY. At the meeting, UCE-2 was re-introduced to Kiselev in person as UCE-1's business partner at MLI.  Also present at the meeting was UCE-3, who was introduced to Kiselev as one of UCE-1's clients involved in a real estate money-laundering scheme initiated by UCE-1 and UCE-2. After a brief review of Kiselev's prior requests of UCE-1, the group discussed UCE-3's connection to a family construction business located in Athens, Greece (hereafter, "Greek Construction

Business"). UCE-3 described a situation wherein his/her Greek family had acquired approximately €100 million in profit from construction contracts, on which the family had not paid taxes.

29.     Kiselev suggested he was able to assist UCE-3's family with laundering the money through the Ukrainian Grain Contract Scheme. Kiselev estimated the fees for money-laundering services related to the aforementioned scheme would be between 4.5% and 4.75%, with an additional fee levied by European Bank One. At the conclusion of the meeting, Kiselev asked UCE-1 to set up a separate Signal group chat between all parties present in order to discuss partnering on a deal to launder UCE-3's cash.

30.     Regarding previously discussed schemes, Kiselev told UCE-1 the Power Grid Scheme continued to encounter delays related to issues concerning his clients' notoriety. Further, the client who initiated the extortion and bribery scheme had decided to explore a whistleblowing strategy as opposed to following through with paying a bribe to UCE-1's IRS contact.

31.     Between October 13, 2021 and December 6, 2021, Kiselev and UCE-3 exchanged a series of messages via Signal in which Kiselev sent specific details regarding the Ukrainian Grain Contract Scheme. Kiselev assured UCE-3 that he could launder hundreds of millions in cash through his allies at European Bank One by means of the money-laundering apparatus built on the Ukrainian grain commodities market.

32.     As a result of Kiselev's pitch, UCE-3 attempted to arrange a meeting with Kiselev and Kiselev's European Bank One contact(s). Transcripts of relevant messages sent by Kiselev to UCE-3 via Signal in approximately October 2021 regarding his money-laundering scheme follow:

Kiselev:         Moving funds through Dubai company under grain commodities contracts.

Beneficiary will be newly established Dubai company with accounts at [European Bank One] Vienna office. This is absolutely optimal scenario when funds will be accumulated and reside with the premium, and one of the world argest [sic] private bank, where we have relations with key management contacts that will ensure control and safety. Also this would be ideal platform for setting up functioning real estate investment fund. Much better then [sic] using one of the Dubai based banks.

All in costs 5.5-5.75%. Higher by about 1% then what we discussed, but with [European Bank One] as the final destination for the funds, it will be much better and more structured solution. Movement of funds also presents challenges and costs, which became clearer when we dived into details. Half of fees would need to be taken with the first tranche. That mean to pick up 10-20 mil for the initial transfers and 5 mil toward fees. Funds will be picked up on a monthly basis from the client in Greece, they will not need to be moved to another location by the client.

Funds will be wired out and accumulated at the rate of 20-30 mil per month. If it could be done faster then it will be, may be within 5-6 months all together. Actual wires will be done on a daily/semi daily basis, with amount at risk will be limited to the amount of a single wire, 1-1.5 mil (if specific wire stoped [sic]/suspended by the correspondent bank for example). No follow up wire will be initiated till the previous one will be successfully credited.

From the client's side we need a beneficiary owner, which we will arrange to be pre approved by the bank, and coverage of initial expenses of up to 100k (that will cover establishing new company and preparing elements of logistics). I can travel to the location, presumable Athens, Greece, to collect this and meet with the client's team. Time line from the point of receiving required information and initial fees from the clients, to being ready to receive first wire into the new company – 3/4 weeks.

33. On December 19, 2021, Kiselev and UCE-3 met in San Francisco, CA. By this point, Kiselev had made it clear that both the Power Grid Scheme and the bribery and extortion scheme concerning the Extortion Targets were no longer viable options. Neither Kiselev nor his bank contact could locate a suitable client to pose as the seller in the purchase agreement, and Kiselev's bribery and extortion client had decided to file a whistleblower complaint against the Extortion Targets.

34. Concerning the financial troubles beleaguering UCE-3's family, Kiselev stressed the need for UCE-3 to act quickly in order to take advantage of the unique opportunity to launder large amounts of money through Kiselev's contacts at European Bank One. To this end, Kiselev instructed UCE-3 to set up a meeting between himself, UCE-3 and representatives of

UCE-3's Greek family in Europe by mid-January 2022. Kiselev promised to bring his bank contact to the meeting.

**f. Kiselev and Polyanskyy Agree to Launder Drug Trafficking Proceeds**

35.     On January 25, 2022, UCE-3 held two meetings with Kiselev in Madrid, Spain. At the first meeting, Kiselev continued to elaborate on the details of the Ukrainian Grain Contract Scheme, especially in terms of its viability as a solution for UCE-3's family.

36.     Immediately following their initial meeting, Kiselev and UCE-3 held a subsequent meeting with UCE-4, who was introduced to Kiselev as UCE-3's cousin from Athens, Greece. More specifically, UCE-4 posed as a Greek citizen who was both the main representative of UCE-3's Greek family and the chief executive officer of the Greek Construction Business.  Simultaneously, Kiselev introduced UCE-3 and UCE-4 to his associates: **Vladyslav Polyanskyy ("Polyanskyy")**, and INDIVIDUAL 2. Kiselev characterized Polyanskyy as a consultant with a close, long-standing relationship with European Bank One who could provide numerous financial services to UCE-3 and UCE-4. Likewise, Kiselev described INDIVIDUAL 2 as a banking consultant who could serve as an asset in terms of securing the assistance of European Bank One.

37.     Together, Kiselev and Polyanskyy detailed the Ukrainian Grain Contract Scheme, specifically explaining how UCE-4's cash could be stealthily blended into the enormous size and scope of Ukraine's global grain commodities market. As stated in past meetings, Kiselev highlighted his access to corrupt officials within the Ukrainian government who took bribes to create falsified purchase orders and manipulate export records. UCE-3 and UCE-4 provided background on the approximately €100 million the Greek Construction Business had accrued by means of avoiding tax payments on legitimate construction contracts. UCE-3 and UCE-4

admitted their family's large cash position had become a problem as of late, which caused UCE-4 to decide this was an appropriate time to accept some risk in order to clean the money so as to avoid penalties or punitive action. Therefore, UCE-3 and UCE-4 expressed interest in beginning the process of laundering approximately €100 million held by their Greek Family in Athens through Kiselev and Polyanskyy.

38.     Having struck a nascent agreement with UCE-3 and UCE-4 to launder funds, Kiselev and Polyanskyy presented the fundamental elements of the Ukrainian Grain Contract Scheme tailored to the needs of the Greek Construction Business. Kiselev repeatedly underscored the necessity of creating a shell LLC in Dubai, outwardly appearing to be a global grain commodities trader, which would serve to validate rafts of phony or overvalued grain contracts generated by the scheme. The shell LLC was the key deceptive component of the plan as it was designed to safeguard UCE-4's cash by generating a plausible transaction record covering all financial transactions, thereby anonymizing true ownership of the funds. Again, Kiselev advertised his partnership with corrupt government officials who would green light the sham or manipulated grain contracts ultimately exchanged through the shell LLC. Respecting any actual grain purchased through the scheme, Ukrainian farmers, and/or the export companies, would be paid cash, while all outgoing or incoming wires would be falsely documented through the shell LLC as payments related to the import and export of fictitious or overinflated grain contracts. According to Kiselev, through this structure, UCE-4's cash would be deposited into the shell LLC's accounts, disguised to appear as funds generated by purchase and sale of grain and backstopped through a record of falsified, manipulated or cloned contracts. Kiselev explained that he and Polyanskyy would take possession of UCE-4's cash through multiple cash pick-ups in Europe, after which the money would be routed through the shell LLC. UCE-4's

funds, or the equivalent value, would be deposited into a European bank account, managed by Polyanskyy, through numerous wires linked to and legitimized by the shell LLC. Polyanskyy explained he would serve as the nominal beneficiary of the European Bank One account, acting as the account's owner in order to insulate UCE-4 from the scheme. However, Polyanskyy maintained that UCE-4 would retain control of and enjoy unfettered access to the funds in the bank account.

39.     Between February 8, 2022 and March 19, 2022, UCE-3 exchanged a series of messages via Signal with Kiselev. Kiselev advised he and Polyanskyy were prepared to accept up to €5 million as the first tranche of the entire sum to be laundered by means of a discrete cash pick-up in Europe. As promised, Kiselev sent UCE-3 a nominal beneficiary contract drafted by Polyanskyy relating to the European bank account, which was to be signed by UCE-4 and Polyanskyy.

40.     Transcripts of Signal messages between Kiselev and UCE-3 sent on February 13, 2022 appear below:

UCE-3:      Yes, everything has been very positive from my perspective.

Kiselev:    Vlad will provide draft contract for his services as a nominal beneficiary sometimes [sic] tomorrow.

Kiselev:    Completely agree that it make sense to engage his [sic] in the capacity now. And have separate discussions about other roles he might perform.

UCE-3:      Excellent. Thanks for the feedback on both points.

Kiselev:    [UCE-4] Hi, here is the draft contract with Vlad for his services as the nominal beneficiary. Feel free to review and send me follow up questions. Regards, A.

            [DT_v1.docx (17.1kB) document sent]

41.     In approximately March 2022, UCE-3 advised Kiselev that, upon consideration of the need to further shield UCE-4 from exposure to potential law enforcement action and ensure secure transfer of funds in Europe, UCE-3, with UCE-4's blessing, had solicited UCE-2's

services in furtherance of the scheme. Specifically, UCE-3 told Kiselev that UCE-2 would launder the Greek Construction Business' funds though UCE-2's MLI bank accounts and deliver equivalent tranches of cash to Kiselev and Polyanskyy. Therefore, Kiselev understood UCE-2 would serve as the main conduit through which he would receive funds from UCE-4. Further, UCE-3 explained that because UCE-4 decided to first launder funds through UCE-2's business accounts, the cash delivered to Kiselev and Polyanksyy would take the form of U.S. dollars, not Euros. Kiselev agreed to this added layer of laundering through UCE-2, noting that the extra step would likely add costs to UCE-3's side and any delay of the first cash pick-up in Europe increased their risk of exposure.

### g. The Final Meeting in Madrid

42.     On April 26, 2022, UCE-2, UCE-3, and UCE-4 met with Kiselev and Polyanskyy for a second time in Madrid, Spain. At the beginning of the meeting, UCE-2 candidly stated that UCE-2 was asked by UCE-3 and UCE-4 to launder the Greek Construction Business' €100 million through UCE-2's MLI bank accounts in Europe. In equally plain language, UCE-2 made clear the fact the MLI bank accounts were regularly used by UCE-1 and UCE-2 to launder proceeds of illegal drug sales for South and Central American-based, transnational narcotics-trafficking cartels. Further, UCE-2 described how UCE-2 and UCE-3 had already agreed to a one-to-one cash transfer, for a 1% fee, through which UCE-2 would accept UCE-4's €100 million and comingle the funds with illegal drug trafficking proceeds in order to further conceal UCE-4's involvement. Additionally, UCE-3 and UCE-4 explained their plan was advantageous to the entire group as it not only added an extra layer of anonymity by means of a trusted professional money-launderer, it eliminated the need to physically transport cash from Athens, Greece, to Madrid, Spain.

43.     Kiselev and Polyanskyy acknowledged the update to the plan and understood that the funds to be delivered at the first cash pick-up would be illegal drug trafficking proceeds. Regardless of additional layer of laundering and the nature of the funds they would be accepting from UCE-2, Kiselev and Polyanskyy agreed to pursue and finalize the money-laundering scheme with UCE-3 and UCE-4.  An excerpt of the transcript of the meeting relevant to knowledge of illegal drug trafficking proceeds appears below:

UCE-2:          Yeah. I mean, look, I said this early on. This is your deal. I don't care what the fuck you guys do. I'm here to help. I have the means to help. I have the resources to help, you know. But in full disclosure, you guys got to understand that you know, the people that are my clients are in Cartagena and they deal in commodities too, right. I guess everybody understands, but they're not in grain, right. And I don't deal with the product side of the coke stuff, I don't deal with the…like, this is their fucking money and they take it serious. So, as long as you guys are aware, like, I don't have any problem with it because it's just ledger stuff for me, right. Like, I don't get in on the product side. It's ledger stuff for me. So, I want you to understand, you know, I'm going to help you out, it's going to cost you, but you guys got to understand, that like, I'm fucking, you know, this is serious. Once you guys say you want to do this, I'm going to do it. Right? And there can't be like, any backing out. From anybody's side. Right? Because you know, I can plus up my account in Madrid and take it out of what I have going on in Cyprus or Greece, right? So- or Athens, I should say. But, you guys got to understand that. Like, if that's something, you just got to tell me that's what you want to do.

UCE-3:          Yea, I'm definitely all in. But, is there something we definitely need to do? I would definitely want to move forward.

UCE-2:          But I need, like obviously, ultimate discretion from everybody here. So, if anybody's going to get involved, I just want discretion. That's all I ask. And I will help you out and I have no problem doing that. At any point in time, alright? But-but, I'm not in this business to be free. You know, I'm in this business to be quite honest, to make money. I'm going to hear-I'm going to help you, but the reality is that you can have the money here, in Madrid, without you know, having to worry about getting it out of-out of Greece. Alright?

UCE-4:          That's definitely a big plus for me anyways, that's going to add that extra layer that I discussed with [UCE-3] and beyond that, I guess we can default to you the plan of building the LLC.

Polyanskyy:     So…so, what is that going to look like now with everything that's going on because those were some of my concerns.

Kiselev:        So it's split into two, basically in terms of the implementation side [UI..] the…paperwork basically stay the same.

| UCE-3: | Nothing has changed. |
|---|---|
| Kiselev: | Again, given the size that we talked about, we have ten times more. Given the size of what- really, nothing changed. We need to figure out the LLC, set up the bank, which company, etcetera. The ultimate beneficiary part. So, basically, I divided it between the cash part, it's my part and [UCE-2]'s part. There's two people that are responsible for it, [UCE-2] for his part, I for its part. Then, there is a Chinese wall and that it starts, where Vlad, you know, if you're comfortable, if he's comfortable you come to an agreement because there has to be an agreement between him and you. |
| UCE-2: | What is your role? In the LLC and then potentially in the bank? |
| Kiselev: | Well, I brought in Vlad as somebody who I've known for— |
| UCE-2 | So-so you're done. |
| Kiselev: | Yea. Yea. I mean, my role would be to digest it, [UI] and foresee that he is the one who is the ultimate beneficiary and [UI] who documents and manages the funds. |
| UCE-2: | So, how would the money go from Spain to Dubai? |
| Kiselev: | Well, under the same condition, then I'll take it. We'll need to decide where the funds will be accumulated, be sustained. Then I you know, I'll be taking it from Spain. I told them, we'll need months to months to set up an LLC and to set up the official owner, etcetera. And then during that time, the funds will be accumulated. I don't know, it's up to [UCE-2] to keep the schedule, whether they accumulate it immediately in Spain or whether it's like it drops every week, or every two weeks, etcetera. |

44. Throughout the meeting, Polyanskyy continued to stress the need for the group to create a comprehensive, detailed, well-documented, yet false track record of what appeared to be legitimate and legal business transactions through numerous wire transactions recorded at European Bank One. An excerpt from the transcript of the meeting concerning Polyanskyy's concerns regarding concealing the true nature of wires related to the scheme appears below:

| Polyanskyy: | Just, for the bank, the whole world is, I'm owning the money. And, what's critical is how I earned that money. Because no link to your construction or any other businesses you are involved with, taxes, no taxes, we have to create from scratch 100% legit history of how I made that money. |
|---|---|
| UCE-3: | Okay. |
| Polyanskyy: | That's why we are much more concerned in a sense than you because as I would be responsible for this…for this stack. I have to be able day or night answer all |

the questions how I made a single dollar or 100K or whatever amount you entrust me.

UCE-3        Yeah.

Polyanskyy:  But, in other words, how I earned this money.

UCE-3        Yeah.

45.    Throughout the meeting, Polyanskyy, citing his knowledge of the current regulatory posture in Europe, repeatedly raised concern that large deposits of cash, especially those lacking supporting documentation recording valid transactions, into new bank accounts would attract unwanted attention.  An excerpt from the transcript of the meeting relevant to Polyanskyy's admonishment to the group concerning regulatory oversight appears below:

UCE-4:       So, I'm not a pro at this I don't know much, but I know this. I wanna start
             crediting slow to see how that works, but then you tell me what the fastest way for
             me to clean my money.

Polyanskyy:  That's perfect…what I'm hearing, because if you start saying, sorry to say, but
             like unrealistic expectations, we're gonna be like longer term, we're gonna be like
             screwing up the whole…everything that we're planning to build. So, what Alex
             has been…I hope…I think…we are in full coordination in terms of like
             communication, and what I hear is like initial like sum amounts would allow us
             first even to present you with different, several options. What is… as of today,
             because you know, the compliance, the KYC, know your customer, anti-money
             laundering etcetera, regulations are changing day by day. You know, in terms of
             how banks are looking, what's more comfortable, what's less. You know, we've
             been living in this world and like every day is a new, especially in the last two
             months, changed completely. The situation…suddenly it's a flood, from Russia,
             Ukraine, people with bags of cash in Europe.

46.    Understanding UCE-2's role in the plan, Kiselev and Polyanskyy elaborated on the system they planned to put in place to routinely launder UCE-4's cash.  An additional excerpt of the transcript appears below:

Polyanskyy:  We...we go back to our sort of like system provider who, and work it out in
             practical steps as to what's better and then to coordinate it with the first initial
             step. So all of it is moving, you know, moving in steps, and there is no, like,
             bottlenecks, or no, like, mismatches which are completely [UI].

Kiselev:     We can accumulate the first part. We talked about the first part—

UCE-3:        Yes, yes, yeah.

Kiselev:      To digest my and [UCE-2]'s part.

UCE-3:        Yes, that's done. [OC]

Kiselev:      So, I know how it works. [UCE-2] knows how it works [UI] with my structure. And in fairness, we need a month to go to [UI] the contract, the real contract, everything to set up the LLC, to run everything by the bank, and spend some money on that [UI].

UCE-3:        So, with that… with, with the hundred…hundred million figure in mind, a lot of this is gonna be based on, as you look forward and speculate, okay, how does it make sense to make these deposits based on these contracts? A lot of, if I'm not mistaken, if I'm understanding this right, it's gonna be you telling us, "Okay, this month would be a good month for a 10 million dollar deposit." And then, maybe the next month, will be less, or more, or is it gonna be like a regular schedule, or is it really gonna fluctuate based on?

Kiselev:      I talked to the guys and basically, for our amounts, which I told them up to 20 mil a month, doesn't make much difference.

UCE-3:        Okay, okay.

Kiselev:      So we still have the flow.

47.    Ultimately, Kiselev and Polyanskyy remained committed to their money-laundering scheme, regardless of the fact they were aware the cash they would receive in Madrid would come from narco-trafficking accounts managed by UCE-2. Kiselev indicated he would be in charge of purchasing the fake grain contracts and setting up the phony LLC in Dubai, while Polyanskyy indicated he would handle the money movement, as well as serve as the nominee beneficiary account holder at European Bank One once the funds were deposited. An additional excerpt from the transcript of the meeting concerning logistical considerations regarding timing appears below:

UCE-4:        How much time do you need to build the LLC and start the process going?

Kiselev:      You know, I think we talked to like the initial LLC, everything that we talked about, up to a hundred [OC]

UCE-4:        But how much time do you need for us to be able to receive that money?

Kiselev:    A month? We can receive it tomorrow. I can call to comfortably if people I talk to up to the five and then take the expenses from that five, and then set up LLC, et cetera.

48.    Throughout the meeting, Polyanskyy, observing that he and Kiselev would equally share the risk of being caught, continued to stress the need to diligently and carefully conceal the true nature and origin of the funds through multiple layers of paperwork, contracts, real estate purchases, and commodity contracts. Upon UCE-3 referencing a previous request by Kiselev for cash to be sent by UCE-2, prior to the first major money laundering transaction, in order to pay start-up fees, Kiselev estimated he would need approximately $100,000. Polyanskyy noted that sending the $100,000 by means of wire transactions would allow ample opportunity for the group to manufacture a well-documented, historical, systematic record of innocuous financial transactions between UCE-2, Kiselev, and Polyanskyy recorded under deceptive pretenses. An excerpt from the meeting regarding Polyanskyy's focus on developing a credible track record to avoid exposure to law enforcement action appears below:

UCE-2:    I..I mean, yeah, that's a non- that's a non-issue, with [UCE-1] through MLI. I think he talked to you about that, right? Or whatever, you know. I could, I could do that. All you have to do is, and I don't know how, whatever, how you wanna handle what amount… and then, Alex, like into what account? Like, I just would need, I guess, I would need a routing number to route that into an account.

Kiselev:    Yeah, we're talking about the cash.

UCE-2:    Are you talking about the cash?

UCE-3:    Well, I-

UCE-2:    Well, are you talking about the cash for the startup?

UCE-3:    Yeah, well yeah, we had talked about- we had said, what we had talked about initially was, we would either you take it out of the five million or we show up with five… five point one million, and you'd take that, start it up. I'd like to go ahead and get you guys started on that now. I just don't know about the cash portion of it.

UCE-2:    I can handle that. I mean, that's what I'm saying. If everybody's okay with it, just give me the account. I can route it to your account or an account that you have. You just gotta tell me how to bill it. Right? You gotta tell me, is it like consulting

| | |
|---|---|
| | fees, is it like whatever, you just need to tell me what it is and then I'll get it to you from MLI and we'll get it to you, you know, within – |
| Kiselev: | We can, we can take through the wire, Vlad's company, or we can take it as cash |
| UCE-2: | Well, I'll tell you, I'll tell you what, what would help me out, what would actually help [UCE-1] out too, with MLI, this is just kind of the way we do it. It just makes us look really good on the back end for our business in San Francisco. So if I can wire it to you, that's fine. It would help me out if everyone's into helping each other out, then it would work perfect for me, if not, you know… |
| Kiselev: | I got a hundred thousand [dollars] for startups [UI] to be wired for purposes of- |
| UCE-2: | Yeah, that's easy. [OC] So, I gotta know how would I- could it be- tell me what the bill would be for. |
| Kiselev: | We can issue the… if Vlad would be the recipient he needs to figure that out. |
| UCE-2: | So why does it- what kind of fee it be, would it be… |
| Polyanskyy: | You know, I… |
| UCE-2: | Consultant fee? Transaction fee? |
| Polyanskyy: | I'd be very much in favor of, like even from the first wire, we start creating a history. I mean, it's possible to discuss it with our service provider that, on the back end, which is grain contracts, yeah. So like we already like I'm- I even prefer to receive it as a physical individual- |
| UCE-2: | Okay. |
| Polyanskyy: | …with account, for example- |
| UCE-2: | Right. |
| Polyanskyy: | …if we are to select… |
| UCE-2: | Right, I get that. I can send it wherever you want, however you want. You guys just tell me- |
| Polyanskyy: | Yeah, we'll pick and choose. I mean, it's just a matter of a few days to prioritize it. |
| UCE-2: | Is it goods and services? Is it consulting? 'Cause that helps – |
| Polyanskyy: | No, no, no, definitely advisory or consulting financially, yeah. |
| UCE-2: | No, I get it, yeah. |
| UCE-3: | And- |
| Polyanskyy: | Not, not…not goods. |
| UCE-2: | Okay |

| | |
|---|---|
| UCE-3: | And then… |
| Kiselev: | We can send some from here and just [laughter]… |
| UCE-3: | And then, what? And then, what do you need, for instance? What information do you need from [UCE-4] or from the business? So that it way it looks… |
| UCE-4: | Should it be a name? I was thinking more business |
| UCE-2: | Yeah what should be? Like how does that look? What do you need to make it look like for your client? You know, just- just a name and identifiers, or what? |
| UCE-3: | For…for [UCE-4]. I mean, you're representing [UCE-4]. |
| Polyanskyy: | Our internal information, that's one thing. We would be completely private for the rest of our relationship. |
| UCE-3: | Okay, yes. |
| Polyanskyy: | But to the outside world, I don't know anybody. |
| UCE-3: | Ah okay I'm, again, I'm confusing things. |
| Polyanskyy: | I'm just making my money on grain trading. |
| UCE-3: | Ah okay, okay alright, so- |
| Polyanskyy: | I just want to nail it guys, otherwise we're in for a big surprise… |
| UCE-4: | That was my concern. And how- |
| UCE-3: | You're the benefic- |
| Polyanskyy: | That's exactly- what I'm saying is we need to create a history. Even with this like hundred K, which is like non… non-event, but still it would provide, like even initial capital. For… for example, further down the road, Dubai regulator, if we are to set up in Dubai, like I got a hundred K, and I… whatever, I bought some rights to existing other grain contracts, which were, you know, and we're gonna create a system in place, but I need this initial whatever, you know, hundred K or half a mil or a mil, to make out of...not to make money out of nothing, which is really badly taken nowadays by banks, by anybody, by compliance, et cetera. So hundred K would really be like a first bridge into, you know, a long-term history. Even a hundred K as low as it looks- |
| UCE-4: | Do you have to explain the first hundred thousand dollars? |
| Polyanskyy: | …we'll handle legit explanations, contracts, some agreement, consulting services I've provided. |

49. At the conclusion of the meeting, Kiselev and Polyanskyy informed the UCEs

that they preferred to start the money-laundering process with a $1 million cash pick-up in

Europe, which they described as a pilot transaction, in the very near future. Polyanskyy advised he would soon provide the contract, via Signal, through which he would become the primary beneficiary accountholder to UCE-4. UCE-2 agreed to begin sending wires, consisting of funds related to the start-up fees Kiselev requested, from UCE-2's MLI accounts to Polyanskyy's corporate bank account upon returning to the U.S. from Spain. Polyanskyy advised he would provide his account information to UCE-2 via Kiselev.

### h.  International Wire Transfers

50.  Between approximately April 22, 2022 and May 10, 2022, Kiselev, UCE-2 and UCE-3 exchanged a series of messages through Signal in which Kiselev sent multiple drafts of consulting and advisory agreements for review. The agreements were designed to falsely document established contractual relationships between UCE-2, Kiselev, and Polyanskyy. Kiselev advised that European Bank One required the agreements in order to cover all wires between the aforementioned parties routed through the financial account managed by Polyanskyy. In messaging with UCE-3, Kiselev specifically stressed the need to finalize the nominal beneficiary accountholder contract between UCE-4 and Polyanskyy, highlighting the integral role Polyanskyy played to the money-laundering scheme. Initially, Kiselev discussed protecting each wire transfer with a consulting contract to disguise the wire's true purpose. Eventually deciding against this approach, Kiselev drafted separate consulting contracts demonstrating that he and Polyanskyy had individual agreements with UCE-2. Each consulting contract contained a $10,000 per month fee structure for payments to be made to Kiselev and Polyanskyy, which were money-laundering fees disguised as legitimate payments for services. Ultimately, however, Kiselev settled upon signing a master consulting contract with UCE-2, which did not involve Polyanskyy, for the purpose of streamlining the process. Kiselev doubled

the consulting fees in the final contract with UCE-2, advising that he would initiate transfers to Polyanskyy out of his own bank account after each respective wire from UCE-2. Per Kiselev's instruction, UCE-2 signed a consulting contract with Kiselev, which covered all payments made to Kiselev from UCE-2's bank accounts. In addition to the consulting contract, Kiselev provided UCE-2 with international wiring instructions specifically for payments related to $100,000 which Kiselev and Polyanskyy requested as start-up fees. In direct messages on Signal with UCE-2, Kiselev specifically reiterated his instructions that UCE-2 should record all wires as "consulting fees".

      51.     Excerpts from transcriptions of the aforementioned Signal communication between Kiselev and UCE-3 are included below:

Kiselev:     [UCE-3], hi, I will be sending you in a second two consulting agreements, with two wiring instructions, for transferring $100k in set up costs. One for Vlad and one for myself. Some expenses and charter capital will have to be paid by Vlad as an ultimate beneficiary, and some indirect expenses will have to be covered by me. Please see if this can be done quickly. Also I would encourage to finalise [sic] and sign agreement with Vlad about his role as a beneficiary. Regards, A.

Kiselev:     [Transmits "2022-04-29_A…greement.docx"]

           [Transmits "2022-05-02_A…greement.docx"]

…

Kiselev:     Ok, will coordinate [with UCE-2] since my bank will request signed contract copy for sure. Will be in touch.

           And please keep in mind to finalise [sic] agreement with Vlad. After all he is essential in this process.

           We need to speed up our timing. Everything taking too long. We need to move faster on everything, or costs will make this process very expensive. I am sure you understand.

UCE-3:     Hello Alex. [UCE-4] is good with the last agreement Vlad sent right after Spain. I apologize if I did not make that clear. What else needs to be done from that aspect? Just sign the contract and send back?

…

Kiselev:     I understand and completely agree. Please let me clarify. I am talking about

contract between your side and Vald [sic]. For him to be nominal beneficiary etc. Not the consulting contracts for 50/50 wire to me and him.

Consulting agreements have to go through [UCE-2] since his entities will have to execute payments/wire. That is clear.

UCE-3:        All clear. Thanks.

Kiselev:      I just realized [sic], my mistake. Sorry, have been under a lot pressure last few days. Will make changes to both agreements and will send to you.

52.    On May 10, 2022, UCE-3 received a direct message on Signal from Polyanskyy

instructing UCE-3 to have UCE-2 send all proposed wire transfers to Kiselev. A transcription of the message, as well as UCE-3's response, is included below:

Polyanskyy:   Hi [UCE-3], it's Vlad from Alex. Confirm that the whole amount would be better to be wired to his account for ease of further disbursements.

UCE-3:        Great Vlad. Thank you. Hope you and your wife are doing as well as can be expected.

   **i.  Allegations Specifically Related to Count 2, Charging a violation of 18 U.S.C. § 1956(a)(3)(B)**

53.    On May 23, 2022, FBI Agents utilized a covert desktop computer located at FBI

San Francisco's Division Headquarters ("SFHQ"), located 450 Golden Gate Ave., 13th Floor,

San Francisco, CA, to initiate a $10,000 wire from a covert FBI bank account to a JSC Universal

Bank account controlled by Kiselev located in Ukraine. As instructed by Kiselev and Polyanskyy

at the April meeting in Madrid, Spain, the transfer was documented as "Consulting Services". On

approximately May 29, 2022, Kiselev confirmed receipt of the aforementioned $10,000 wire to

UCE-3 through a message on Signal.

54.    By late May 2022, Kiselev advised he had changed the plan regarding his

preference for UCE-2's wire destinations, instructing UCE-3 that, in addition to continuing to

send wires to Kiselev, UCE-2 would need to send wires directly to Polyanskyy in the future in

order to allow Polyanskyy to directly cover the costs of setting up the money-laundering

apparatus.

55. Transcriptions of Kiselev's Signal messages to UCE-3 sent on May 29, 2022 appear below:

Kiselev: Hi [UCE-3], To keep you updated. [UCE-2] made initial transfer early last week. It was for 10k and I got an impression that [UCE-2] scheduled weekly traders [sic],which mean it will take almost to the end of summer to aggregate set up fees. I will talk to him later this week and will ask for quicker process. I can't do it in bits and pieces and either will have to pay from my own resources, and then reimburse myself, or we need to receive initial funds sooner then weekly in small increments. Anyway I am sure we will find a proper solution with [UCE-2]. Also I will address with him more precise timing of first transfer in Madrid, my side needs to prepare for that in advance as well. Will keep you posted. Regards.

Kiselev: Also, we will need to go back to separate transfers to me, Vlad and a transfer to [INDIVIDUAL 2]. So not everything will go through me and will enable Vlad and [INDIVIDUAL 2] to cover relevant costs directly.

I will email [UCE-2] two more sets of wiring instructions, again I am sure it can be handled without problem. Thanks.

56. On approximately May 31, 2022, Kiselev sent UCE-2 wiring instructions in which he indicated he wanted a second wire transfer to be sent to a separate bank account, which Kiselev described as an "alternative account", held in the name of INDIVIDUAL 3 at JSC Universal Bank, which Kiselev either owned or to which he had access. Through direct messages on Signal to UCE-2, Kiselev indicated the wire was for him and was related to the start-up fees he requested in Madrid, Spain.

57. Transcriptions of Kiselev's Signal messages to UCE-2 sent on approximately May 31, 2022 appear below:

Kiselev: …guys can send out second transfer today. One to my account and another to alternative one. Totaling 20k. So we expedite transfers, at 10k per week we are still below what is needed to get [UCE-3/UCE-4] project going.

UCE-2: Please send along the information for the 2nd account

Kiselev: Beneficiary [Ukrainian text]

IBAN

[Redacted banking information]

Receiver

[INDIVIDUAL 3]

[INDIVIDUAL 3's address]

Account with Institution [Ukrainian text]

Bank

JSC UNIVERSAL BANK

City

KYIV, UKRAINE

Swift code

[Redacted bank information]

**j. Allegations Specifically Related to Count 3, Charging a violation of 18 U.S.C. § 1956(a)(3)(B)**

58.     On June 1, 2022, FBI agents utilized a covert desktop computer located at SFHQ in order to send a $10,000 wire from a covert FBI bank account to the JSC Universal Bank account belonging to INDIVIDUAL 3, with an address in Ukraine. Based on Kiselev's prior instructions, the purpose of the wire was recorded as "Consulting Services". Once again, Kiselev confirmed receipt of the wire in a Signal message sent to UCE-2.

59.     On approximately June 13, 2022, Kiselev exchanged Signal messages with UCE-2 through which he provided Polyanskyy's bank account information at JSC Universal Bank located in Ukraine. The account listed "Vladyslav Polianskyi" as the beneficiary and had an address in Ukraine.  According to Kiselev's message, Polyanskyy sent Kiselev his account information for the purpose of receiving a wire from UCE-2. Polyanskyy understood the pending wire from UCE-2 was associated with the start-up funds requested by Kiselev and Polyanskyy at the second meeting in Madrid, Spain.

**k. Allegations Specifically Related to Count 4, Charging a violation of 18 U.S.C. § 1956(a)(3)(B)**

60.     On June 16, 2022, FBI Agents visited a bank branch located in San Francisco, CA, for the purpose of sending a $10,000 in-branch wire to Polyanskyy's JSC Universal Bank

Account. As was the case with the prior two wires, the wire to Polyanskyy was recorded as a financial transaction related to "Consulting Services". On June 17, 2022, Polyanskyy sent UCE-3 a direct message on Signal acknowledging receipt of the $10,000 wire.

61.     Transcriptions of Polyanskyy's Signal communication with UCE-3 appear below:

Polyanskyy:     Thank you [UCE-3], all good! Hope the same on your side.

UCE-3:     Hello Vlad, I hope this finds you well. My colleague was supposed to send you a wire today. When you have a moment, can you confirm receipt? Thank you.

Polyanskyy:     Hi [UCE-3], sure, would confirm once it arrives. Thank you in advance.

Polyanskyy:     10 just received, thank you!

UCE-3:     Thanks for letting me know. Cheers.

## III.     Jurisdiction

62.     Section 1956(b)(2) of Title 18 provides that "district courts shall have jurisdiction over any foreign person . . . [if] the foreign person commits an offense under subsection (a) involving a financial transaction that occurs in whole or in part in the United States," assuming service of process is appropriate.  Polyanskyy is a citizen of Ukraine.  This affidavit alleges that he committed offenses under subsection (a), namely three counts under 18 U.S.C. § 1956(a)(3)(B), in addition to one count under 18 U.S.C. § 1956(h).

63.     In addition, Section 1956(f) of Title 18 provides that "[t]here is extraterritorial jurisdiction over the conduct prohibited by this section if "(1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $100,000."  Kiselev is a citizen of both the United States and Ukraine, and Polyanskyy is a citizen of Ukraine.  The conduct alleged occurred in part in the United States, including meetings between Kiselev and various UCEs in the United States, and financial transactions between United States bank accounts and bank accounts abroad.  In addition, the three alleged transactions are related to the same overall scheme and involved

"funds or monetary instruments of a value exceeding $10,000."

**IV.     Conclusion**

64.     Based on the above information, I respectfully submit that there is probable cause to believe that **Aleksei Kiselev** and **Vladyslav Polyanskyy** committed the crimes as alleged in Paragraph 6 above.

/s/ Christopher
Bognanno by AGT
_____
Christopher Bognanno
Special Agent
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 14th day of July, 2022. This application and warrant are to be filed under seal.

_____
HONORABLE ALEX G. TSE
United States Magistrate Judge