UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALEXSEI KISELEV, and VLADYSLAV POLYANSKYY,<br><br>Defendants. | Case No. 22-cr-00428-JSW<br><br>**ORDER DENYING MOTIONS TO DISMISS, SETTING STATUS CONFERENCE, AND INSTRUCTIONS TO PARTIES**<br><br>Re: Dkt. Nos. 72, 74 |

Now before the Court for consideration are motions to dismiss filed by Alexsei Kiselev ("Kiselev") and Vladyslav Polyanskyy ("Polyanskyy") (collectively "Defendants").[1] The Court has considered the parties' papers, relevant legal authority, the record in this case, and the parties' argument at the hearing held on June 6, 2023. The Court HEREBY DENIES Defendants' motions.

## BACKGROUND

**A.    The Indictment.**

On November 9, 2022, a grand jury returned an Indictment charging: (1) Defendants with one count of conspiracy to launder monetary instruments, in violation of 18 U.S.C. section 1956(h); (2) Kiselev with two counts of money laundering, in violation of 18 U.S.C. section 1956(a)(3)(B) ("concealment money laundering"); and (3) Polyanskyy with one count of concealment money laundering. (Dkt. No. 22.)

According to the allegations in the Indictment, beginning in or around August 2020,

---

[1]    Each Defendant joins in their co-defendant's motion. (Dkt. Nos. 75, 76.)

1

Kiselev had multiple contacts with government agents acting undercover ("UCEs") during which he proposed various "money laundering schemes." (Indictment ¶ 1.) Kiselev represented to the UCEs that he had clients outside the United States who were interested in moving large sums of money frozen in European bank accounts to alternative jurisdictions, including the United States. (*Id.*) Kiselev advised the UCEs that "he wanted to hide the origin of some of these funds through apparently legitimate investments or asset purchases." (*Id.*) At a meeting in August 2020, one of the UCEs advised Kiselev that he worked with businessmen from Miami who were encountering financial regulatory issues similar to those encountered by Kiselev's clients. The UCE also told Kiselev that his clients imported "pineapples" from Panama and that he was careful not to ask his clients questions about these imports. (*Id.*)

In January 2022, Kiselev participated in a meeting in Madrid, Spain, where he introduced Polyanskyy to some of the UCEs and discussed additional details of "his proposed money laundering scheme." (*Id.* ¶ 3.) In particular, Kiselev and Polyanskyy proposed to move the UCEs' clients' money without attracting unwarranted scrutiny by routing it "through a series of transactions designed to make it appear to be legitimate commerce relating to grain contracts." (*Id.*; *see also id.* (alleging Defendants would establish a shell company in Dubai that would appear to be a grain commodities trader).)

On or about April 26, 2022, Defendants held another meeting with the UCEs in Madrid. At that meeting, Defendants were informed "that, as an additional layer of security the cash they would be receiving would be laundered in advance via one of the UCEs bank accounts." (*Id.* ¶ 4.) Defendants also were informed the cash they would receive to be laundered represented proceeds from illegal drug trafficking. (*Id.* ¶ 4.)

"Kiselev estimated that he and Polyanskyy would need approximately $100,000 in start-up fees to establish the infrastructure for the broader laundering scheme." (*Id.* ¶ 5.) Defendants "agreed that these funds would be wired from a bank account in San Francisco, California, associated with the drug trafficking operation[.]" (*Id.*) Thereafter, Kiselev was sent two wire transfers in the amount of $10,000 each, which were designated as "consulting services" and Polyanskyy was sent a wire transfer, also designated as consulting services, in the amount of

$10,000.  (*Id.* ¶ 7.)  Kiselev and Polyanskyy confirmed they received the wire transfers.

**B.      The Complaint.**[2]

The Indictment is not the only charging document in this case.  On July 15, 2022, the Government filed a criminal complaint and an affidavit in support of arrest warrants for the Defendants.  (Dkt. No. 1.)  The affidavit includes more detail about the events that give rise to the charges.[3]  According to the allegations in the Complaint, in "early 2019" the Federal Bureau of Investigation ("FBI") was alerted that Kiselev contacted a confidential human source ("CHS-1")

> in order to gain assistance with his intention to surreptitiously launder approximately $1 to $3 billion in funds, which were either frozen in European banks due to sanctions imposed by United States … or European Union … regulatory bodies, or which faced a high-level of international scrutiny because of financial irregularities or due diligence concerns associated with the account owner.

(Complaint ¶ 7.)

"In approximately April 2020, the FBI instructed CHS-1 to advise Kiselev that CHS-1 had a contact in the U.S. who possessed the ability to effectively support comprehensive money-laundering operations[.]"  (*Id.* ¶ 8.)  That contact is the UCE identified in the Indictment as the individual who worked with the businessmen from Miami: UCE-1.  UCE-1, who purportedly worked for a financial consulting company based in San Francisco, MLI Ventures LLC ("MLI").  (*Id.*)  Kiselev arranged to meet with UCE-1 and CHS-1 in Boston, Massachusetts in August 2020.  Between August 2020 and October 2021, Kiselev, UCE-1, and another undercover agent ("UCE-2"), who posed as UCE-1's business partner at MLI, communicated in person, by telephone, or by chat about the various ways Kiselev could assist his clients move money out of Russia to alternative jurisdictions, including the United States.  UCE-2 purportedly was based "primarily in the greater New York City Area."  (*Id.* ¶ 19.)  With one exception, none of meetings between the UCEs and Kiselev took place in San Francisco.  (*See id.* ¶¶ 9-27, 33.)

---

[2]     The Complaint includes allegations about discussions between Kiselev and the UCEs regarding other proposed financial transactions.  The Court limits its discussion to the allegations that are most relevant to the issues raised by Defendants' motions.

[3]     For ease of reference, the Court refers to the complaint and the affidavit as the "Complaint."

In October 2021, UCE-1 and UCE-2 introduced Kiselev to a third undercover agent ("UCE-3"), who was posing as a client involved in a money laundering scheme. (*Id.* ¶ 28.) The group then discussed UCE-3's connections to a family construction business in Greece, which had accumulated €100 million in profits. UCE-3 advised the group that their family had not paid taxes on those funds. (*Id.*) Kiselev suggested he could assist UCE-3's family by laundering the funds. Kiselev and UCE-3 then began a series of discussions about how that might occur, which included the possibility of utilizing phony or overvalued Ukrainian grain contracts. (*Id.* ¶¶ 18, 29-34.) In December 2021, Kiselev and UCE-3 met in San Francisco. At that meeting, Kiselev asked UCE-3 to arrange a meeting in Europe between Kiselev, UCE-3, and representatives of UCE-3's family.

At the January 2022 meeting in Madrid, Kiselev introduced Polyanskyy to UCE-3 and a fourth undercover agent ("UCE-4"), who was posing as UCE-3's cousin. According to Kiselev, Polyanskyy had a close, long-standing relationship with European Bank One and could provide numerous financial services to UCE-3 and UCE-4. (*Id.* ¶¶ 35-36.) Eventually, "a nascent agreement" was born to launder UCE-3's family money using the Ukrainian grain contract scheme, the steps of which did not involve any money flowing to or from the United States. (*Id.* ¶¶ 38-40.) However, in approximately March 2022, UCE-3 advised Kiselev that they had solicited UCE-2's services and that "UCE-2 would launder the Greek Construction Business' funds though UCE-2's MLI bank accounts and deliver equivalent tranches of cash to Kiselev and Polyanskyy" in U.S. dollars. (*Id.* ¶ 41.)

At the April meeting in Madrid,

> UCE-2 candidly stated that UCE-2 was asked by UCE-3 and UCE-4 to launder the Greek Construction Business' €100 million through UCE-2's MLI bank accounts in Europe. In equally plain language, UCE-2 made clear the fact the MLI bank accounts were regularly used by UCE-1 and UCE-2 to launder proceeds of illegal drug sales for South and Central American-based, transnational narcotics trafficking cartels. Further, UCE-2 described how UCE-2 and UCE-3 had already agreed to a one-to-one cash transfer, for a 1% fee, through which UCE-2 would accept UCE-4's €100 million and commingle the funds with illegal drug trafficking proceeds to further conceal UCE-4's involvement.

(*Id.* ¶ 42.)

Defendants agreed to this plan and stated they would need approximately $100,000 to set

4

up the laundering operation and stated that any funds transferred should be described as "advisory" or "consulting" fees. (Complaint ¶¶ 43-48, 50-52.) UCE-2 told Defendants he preferred to wire them the funds, noting "this is just kind of the way we do it. It just makes us look really good on the back end for our business in San Francisco. So if I can wire it to you, that's fine." (*Id.* ¶ 48.) At the conclusion of that meeting, "UCE-2 agreed to begin sending wires, consisting of funds related to the start-up fees Kiselev requested, from UCE-2's MLI accounts to Polyanskyy's corporate bank account upon returning to the U.S. from Spain." (*Id.* ¶ 49.)

Kiselev initially drafted separate consulting agreements "demonstrating that he and Polyanskyy had individual agreements with UCE-2," which contained a $10,000 per month fee structure. Later, "Kiselev settled upon signing a master consulting contract with UCE-2, which did not involve Polyanskyy, for the purpose of streamlining the process." (*Id.* ¶ 50.) Kiselev also provided UCE-2 with international wiring instructions for the payments, "which were money-laundering fees disguised as legitimate payments for services." (*Id.*; *see also id.* ¶¶ 51, 55-57.)

On May 23, 2022 and June 1, 2022, FBI agents used computers located at FBI headquarters in San Francisco to initiate wire transfers in the amount of $10,000 "from a covert FBI bank account" to accounts designated by Kiselev at JSC Universal Bank in Ukraine. One of those transfers was to an account held in the name of "Individual 3," but Kiselev indicated that the wire was for him. (*Id.* ¶¶ 53-59.) Kiselev confirmed he received the funds. (*Id.* ¶¶ 53, 58.) On June 16, 2022, FBI agents visited a bank branch in San Francisco to wire $10,000 to Polyanskyy's JSC Universal Bank account in Ukraine, which Polyanskyy confirmed he received. (*Id.* ¶¶ 60-61.) The Government alleges the three wire transfers "are related to the same overall scheme and involved 'funds or monetary instruments of a value exceeding $10,000.'" (*Id.* ¶ 63.)

The Court will address additional facts as necessary in the analysis.

## ANALYSIS

A.  **Applicable Legal Standards.**

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). "A motion to dismiss is generally capable of determination before trial if it involves questions of law rather than fact."

*United States v. Shortt Accountancy Corp.,* 785 F.2d 1448, 1452 (9th Cir. 1986). However, the Court "may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long" its findings do not invade the province of the jury. *Id.*

To resolve a motion to dismiss, a court generally looks to the allegations in the indictment, which it must accept as true. *United States v. Kelly*, 874 F.3d 1037, 1046-47 (9th Cir. 2017) (internal citations omitted). Defendants ask the Court to consider the allegations in the Complaint. The Government argues the Court cannot consider anything but the Indictment, relying on *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996). In *Jensen*, the Ninth Circuit held that the district court erred by considering accident reports and affidavits to resolve a motion to dismiss for improper venue. *Id.*. Here, in contrast, Defendants ask the Court to consider allegations set forth in a charging document. The Court concludes that fact distinguishes this case from *Jensen*. A court may take judicial notice of court records but cannot accept as true any disputed facts in those records. *See, e.g., Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980). The Court GRANTS Defendants' request to take judicial notice of the allegations in the Complaint.

**B.     The Government Sufficiently Alleges Venue is Proper in this District.**

A defendant has a constitutional right to have a trial in the state and district where a crime was committed. The purpose is this requirement is "to protect the criminal defendant from the unfairness and hardship to which trial in an environment alien to the accused exposes" them.[4] *United States v. Lozoya*, 982 F.3d 648, 652 (9th Cir. 2020); *see also* U.S. Const., Art. III, § 2, cl. 3; U.S. Const. amend. VI; Fed. R. Crim. P. 18. "[W]hen a defendant is charged in more than one

---

[4]   Defendants argue the Government "manufactured" venue in this District, and Polyanskyy also argues the Government manufactured jurisdiction. "The bar for proving manufactured federal jurisdiction is … high." *United States v. Mayer*, 503 F.3d 740, 755 (9th Cir. 2007)  Although the Ninth Circuit has not decided whether "manufactured venue is a defense," it has suggested that the bar to prove such a defense also would be high. *See United States v. Gonzalez*, 683 F.3d 1221, 1226 n.6 (9th Cir. 2012) (quoting *United States v. Chi Tong Kuok*, 671 F.3d 931, 938 (9th Cir. 2012)). Assuming manufactured venue would be a viable defense, the Court concludes the current record does not include allegations or evidence of the type of "extreme law enforcement tactics" that might warrant dismissal. *Id.*; *Kuok*, 671 F.3d at 937-38. The Court concludes the same is true for Polyanskyy's argument regarding manufactured jurisdiction.

count, venue must be proper with respect to each count." *United States v. Corona*, 34 F.3d 876, 879 (9th Cir. 1994) (citations omitted). Venue usually is a question of fact for the jury, which the Government must prove by a preponderance of the evidence. *Lozoya,* 982 F.3d at 650; *see also United States v. Moran-Garcia*, 966 F.3d 966, 971 (9th Cir. 2020); *United States v. Lukashov*, 694 F.3d 1107, 1120 (9th Cir. 2012). However, "[w]here a rational jury could not fail to conclude that a preponderance of the evidence establishes venue, then a court is justified in determining venue as a matter of law." *Lukashov,* 694 F.3d at 1120.

When a criminal statute does not contain a venue provision, a court determines venue based on the nature of the crime and the acts that constitute the crime. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 n.1 (1999) (citing *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998)); *see also Lukashov*, 694 F.3d at 1120. Section 1956 contains a venue provision: Section 1956(i). Therefore, as a matter of statutory interpretation, the Court's analysis of venue will begin with the text of that provision.[5] *See, e.g., United States v. Lopez*, 4 F.4th 706, 720 (9th Cir. 2021). If the text is unambiguous, the Court's inquiry will end. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). If the language is ambiguous, the Court will look to "canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent." *Jonah R. v. Carmona*, 446 F.3d 1000, 1005 (9th Cir. 2006). Finally, the rule of lenity will apply in the event of "grievous ambiguity or uncertainty," and "only if, after seizing everything from which aid can be derived," the Court "can make no more than a guess as to what Congress intended." *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal citations and quotations omitted).

**1. The Government Alleges Venue is Proper on Counts 1 through 3.**

Pursuant to Section 1956(i), a prosecution for substantive counts of concealment money laundering "may be brought in -- any district in which the financial or monetary transaction is

---

[5] Kiselev made a passing reference to the venue provision in his brief, and the Government did not address it at all, which prompted the Court ask the parties to address their best arguments on venue, as a matter of statutory interpretation, at the hearing. (*See* Dkt. No. 88.)

7

conducted." 18 U.S.C. § 1956(i)(1)(A). Defendants argue this section requires that the defendant, rather than a third party, "conduct" the transaction in the venue district. The plain text of Section 1956(i)(1)(A) does not unambiguously resolve that question. "Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme - because the same terminology is used elsewhere in a context that makes its meaning clear, … or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law[.]" *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 371 (1988). Section 1956(i)(3) states that when funds are transferred by wire from one "place to another … [a]*ny person* who conducts (as that term is defined by subsection (c)(2)) any portion of the transaction *may be charged* in any district in which the transaction takes place." *Id.* § 1956(i)(3) (emphasis added). The emphasized language supports Defendants' position that the person charged must "conduct" the transaction.

The meaning of "'conducts' includes initiating, concluding, or participating in initiating or concluding a transaction[.]" 18 U.S.C. § 1956(c)(2). However, Section 1956 does not define "initiate" or "conclude." Using dictionary definitions of those two words, in the context of the statute, "initiate" refers the start or beginning of something, and "conclude" refers to an ending. *See* https://www.merriam-webster.com/dictionary/initiate ("to cause or facilitate the beginning of: set going"); https://www.merriam-webster.com/dictionary/conclude ("to bring to an end especially in a particular way or with a particular action").[6]

The record establishes that Defendants received the wire transfers in Ukraine. (Complaint ¶¶ 53, 58, 60.) Using the dictionary definition of "conclude", the allegations contained in the Complaint and the Indictment do not support a finding the transactions at issue were concluded in this District. Using the dictionary definition of "initiate", the allegations do not support a finding that either Defendant began the transactions because the Government alleges the FBI agents sent the wire transfers. The Court concludes that whether the allegations show venue is proper in this

---

[6] *See also* https://www.oed.com/view/Entry/96066#eid467207 ("Initiate" defined as: "[t]o begin, commence, enter upon; to introduce, set going, give rise to, originate, 'start' (a course of action, practice, etc.)."); https://www.oed.com/view/Entry/38300?rskey=7SxVOa&result=2#eid ("Conclude" defined as: "[t]o bring to a close or end; to wind up, finish, close.").

8

District turns on whether the allegations are sufficient to show Defendants "participated in initiating" a transaction.

In the Indictment, the Government does not specifically allege that the wire transfers were sent from San Francisco. It does allege Defendants agreed the start-up funds would be wired from a bank in San Francisco and alleges the money laundering counts occurred "in the Northern District of California and elsewhere." (Indictment, ¶¶ 5, 7.) Accepting the latter allegations as true, the Court concludes, for purposes of resolving this motion, it is reasonable to infer that agents were in this District when they initiated the wire transfers. That inference is supported by the allegations in the Complaint that FBI agents utilized a desktop computer in San Francisco and visited a bank here to send the wire transfers. (Complaint ¶¶ 53, 58, 60.)

The Government argues the facts in this case are analogous to the facts *Kuok*, where the defendant sent a money order to an agent and the agent withdrew the funds in the venue district. 671 F.3d at 937. The court did not analyze the language of Section 1956(i)(3), but it did find that venue was proper "because part of the conduct that formed the offense occurred in the Southern District of California, even if that conduct was performed by an undercover government agent[.]" 671 F.3d at 938. Here, the Complaint contains information that Kiselev communicated with the UCEs about the wire transfers, and the larger scheme, via an encrypted smartphone application, Signal. (*See* Complaint ¶¶ 11, 39-40, 50-51.) It also includes information that Polyanskyy communicated with UCE-3 via Signal and instructed UCE-2 to send all proposed wire transfers to Kiselev. (*Id.* ¶ 52.) The Court concludes those allegations are sufficient to allege that Defendants "participated in initiating" a transaction in this District.

Accordingly, the Government sufficiently *alleges* that venue on Counts 1 through 3 is proper in this District. *Cf. Kuok*, 671 F.3d at 938.

### 2. The Government Alleges Venue is Proper on Count 4.

Venue for conspiring to commit money laundering "may be brought in the district where venue would lie for the completed offense … or in any other district where an act in furtherance of the … conspiracy took place." 18 U.S.C. § 1956(i)(2). As discussed above, the Court concludes the Government has alleged venue is proper on the substantive counts. Moreover, each Defendant

9

allegedly communicated with the UCEs via Signal. Based on the allegations in the Complaint, those communications furthered the alleged conspiracy. *See, e.g., Gonzalez*, 683 F.3d at 1226 ("When a conspirator uses a telephone call -- by whomever initiated -- to further a criminal scheme, the conspirator effectively propels not only his voice but the scheme itself beyond his own physical location into that of the person with whom he is speaking.") (quoting *United States v. Rommy*, 506 F.3d 108, 122 (2d Cir. 2007)).

Accordingly, the Court concludes the Government sufficiently *alleges* that venue is proper on Count 4.

### C. The Government Sufficiently Alleges Jurisdiction over Polyanskyy.

Polyanskyy also moves to dismiss for lack of jurisdiction. Section 1956 provides for jurisdiction over a non-citizen if "the conduct occurs in part in the United States … and the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000." 18 U.S.C. § 1956(f)(1)-(2). Polyanskyy argues that the allegations fail to show that he engaged in any conduct in the United States or that the transaction exceeds $10,000. For the reasons articulated above, the Court concludes the Government sufficiently alleges conduct that occurred in the United States.

In the Indictment, the Government alleges that Kiselev estimated he and Polyanskyy would need approximately $100,000 in start-up fees to establish the infrastructure for the alleged scheme and alleges each $10,000 wire transfer was documented as "consulting services." (Indictment ¶ 5.) In contrast to the Indictment, the Complaint includes a specific section addressing jurisdiction over Polyanskyy. (Complaint ¶¶ 62-63.) In the latter, the Government alleges the three wire-transfers "are related to the same overall scheme and involved 'funds or monetary instruments of a value exceeding $10,000." (*Id.* ¶ 63.)

The Court concludes the Government sufficiently alleges jurisdiction over Polyanskyy. Whether the three transactions are "related" is a factual issue that cannot be resolved on a motion to dismiss.

**D.     The Government Sufficiently Alleges Defendants Violated the Money Laundering Statute.**

Finally, Defendants argue the Indictment fails to state an offense. Federal Rule of Criminal Procedure 7(c) requires that an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). "[A]n indictment is sufficient if it…contains the elements of the offense charged and informs the defendant of the charge against which he must defend…" *United States v. Davis*, 336 F.3d 920, 922 (9th Cir. 2003) (internal quotations omitted).

The essential elements of the money laundering counts are that Defendants: (1) conducted a financial transaction; (2) involving property represented to be the proceeds of specified unlawful activity; (3) with the intent to conceal or disguise the source, ownership, or control of the property; and (4) believed the proceeds to be the product of specified unlawful activity. *See, e.g., United States v. Marbella,* 73 F.3d 1508, 1514 (9th Cir. 1996). For the reasons set forth in the analysis of whether venue is proper, the Court concludes the Government sufficiently alleges Defendants "conducted" a "financial transaction" as those terms are defined in Section 1956. The Court also concludes that the Government sufficiently alleges the second and fourth elements. Although the Defendants allegedly discussed how to launder the funds on which UCE-3's family had not paid taxes, the Complaint also includes the allegations that UCE-3 enlisted UCE-2 to pre-launder those funds from accounts linked to drug sales.

Defendants also argue the Government fails to allege the concealment element of the money laundering counts. Tracking the language of Section 1956(a)(3)(B), the Government alleges Defendants acted "with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity, to wit, the distribution of a controlled substance in violation of Title 21, United States Code, Section 841(a)[.]" (Indictment ¶ 7.) "In cases where the indictment 'tracks the words of the statute charging the offense,' the indictment will be held sufficient 'so long as the words unambiguously set forth all elements necessary to constitute the offense.'" *Davis*, 336 F.3d at 922 (quoting *United*

*States v. Fitzgerald*, 882 F.2d 397, 399 (9th Cir. 1989); *accord United States v. Crow*, 824 F.2d 761, 762 (9th Cir. 1987) (permissible to use "bare bones" indictment "so long as statute sets forth fully, directly and clearly all essential elements of the crime to be punished").

In *Regalado Cuellar v. United States*, the Supreme Court addressed the "designed to conceal" element of Section 1956(a)(2)(B)(i), which, in brief, prohibits transporting monetary instruments or funds from a place in the United States to a place outside the United States knowing the transportation is designed to conceal or disguise a listed attribute of the funds. In that case, the defendant was convicted after cash was found in a secret compartment of a car while he was *en route* to Mexico and argued the fact that he concealed the money was not sufficient to convict him. 553 U.S. 550, 553-54 (2008). The Supreme Court reasoned that, in the context of the statute, "'design' means purpose or plan" rather than "structure," as the Court of Appeals had interpreted it. 553 U.S. 550, 563-65 (2008).

The Court noted that structure and purpose may be related, and an individual "may employ structure to achieve a purpose[.]" *Id.* at 565. It held, however, that "a conviction under this provision requires proof that the purpose – not merely the effect – of the transportation was to conceal or disguise a listed attribute." *Id.* at 567. Although there was "abundant evidence that [the defendant] concealed the money in order to transport it," there was insufficient evidence to show why he was moving the money and, in fact, the government's witness testified that the purpose was to compensate leaders of the drug smuggling operation. *Id.* at 566-67. Therefore, the Court reversed the defendant's conviction.

Defendants argue that the allegations do not show they made any effort to conceal the fact that they received the funds in question. "The necessary concealment, however, is that of the source of the funds, not the identity of the money-launderer." *United States v. Tekle*, 328 F.3d 1108, 1114 (9th Cir. 2003) (concluding, post-trial, that evidence was sufficient to show defendant "concealed the nature and source of the funds derived from" a narcotics business); *see also United States v. Manarite*, 44 F.3d 1407, 1416 (9th Cir. 1995) (addressing sufficiency of evidence for a conviction under 18 U.S.C. § 1956(a)(3)).

Defendants also argue that by alleging the wire transfers were for start-up fees, the

12

Government alleges they did nothing more than receive allegedly ill-gotten gains. The Court is not persuaded. In *Manarite,* the Ninth Circuit upheld convictions for concealment money laundering based on a casino chip-cashing scheme. 44 F.3d at 1414-18. The defendants argued the evidence against them was analogous to evidence in cases where a defendant merely purchased a car or a house with drug money. *Id.* at 1416 (citing *United States v. Garcia-Emanuel*, 14 F.3d 1469 (10th Cir. 1994) and *United States v. Sanders*, 928 F.2d 940 (10thc Cir. 1991)). The Ninth Circuit rejected their argument, reasoning that the defendants in those cases "engaged in ordinary commercial transactions with cash that happened to be the proceeds of drug dealing" rather than engaging "in transactions for the *purpose* of concealing assets." *Id.* at 1416 (quoting *Garcia-Emanuel*, 14 F.3d at 1474 (emphasis in original)). The court concluded the evidence against the Manarites demonstrated they "were not simply 'spending' the proceeds of the chip-skimming scheme." *Id.*

The Government's theory, as reflected in the allegations in the Complaint, is the purpose of the start-up fees was to enable the Defendants to create the appearance of a legitimate commercial history between themselves and the UCEs. (*See, e.g.,* Complaint ¶ 48 ("Polyanskyy noted that sending the $100,000 by means of wire transactions would allow ample opportunity for the group to manufacture a well-documented, historical, systematic record of innocuous financial transactions between UCE-2, Kiselev, and Polyanskyy recorded under deceptive pretenses."); *see also id.* ¶¶ 44, 48, 50.)

The Court concludes that the allegations in the Indictment, taken together with the allegations in the Complaint, are sufficient to *allege* Defendants engaged in the wire transfers for the purposes of concealing, at the very least, the nature of the funds in question.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss. The parties shall appear for a status conference on August 22, 2023 at 1:00 p.m., and they shall file a status report by August 15, 2023. It is FURTHER ORDERED that the parties shall meet and confer about whether time between the date of this Order and August 22, 2023 may be excluded under the Speedy Trial Act. If the parties agree, they shall submit a stipulation and proposed order for

13

the Court's consideration documenting the exclusion.

**IT IS SO ORDERED.**

Dated: July 25, 2023

_____
JEFFREY S. WHITE
United States District Judge